IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

In re: HERSCHEL and MARSHA SPIVEY, Debtors     No. 5:08-bk-73400
    Ch. 7

ROBERT and NANCY LEWIS;
WLH, LLC     PLAINTIFFS

v.     5:08-ap-7201

HERSCHEL and MARSHA SPIVEY, Individually
and as Members of Doo Wop, LLC     DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

The plaintiffs, Robert and Nancy Lewis, filed their adversary proceeding on December 18, 2008, to determine the dischargeability of debts under 11 U.S.C. § 523, allegedly owed to them by the debtors, Herschel and Marsha Spivey, and to deny the discharge of the debtors under 11 U.S.C. § 727. The Court scheduled the trial for September 1, 2010. At the beginning of trial, the Lewises advised the Court they were only going to pursue their § 523(a)(2)(A) and (a)(4) causes of action and were dismissing their § 727 cause of action. Additionally, the Lewises dismissed Doo Wop, LLC as a party defendant.

**I. Background**

The Lewises and the Spiveys first met in the 1970s and became friends over the intervening years. In 2001, the Spiveys discussed with the Lewises their idea of building a series of carwashes in Northwest Arkansas based on a "Happy Days" 1950s theme. According to Mr. Lewis, the Spiveys approached the Lewises with a business plan and a request for financial assistance. The parties agreed that the Lewises would provide the financial backing and the Spiveys would provide the day-to-day management and bookkeeping for the carwashes. After further discussion, the parties agreed to go into business and formed Doo Wop, LLC, a limited liability company [Doo Wop]. The first carwash was completed at the end of 2001. In 2002, two additional carwashes were built

and another carwash was purchased and renovated. Finally, in 2004, another carwash was purchased and renovated.

As discussed in more detail below, the Lewises began to have differences with the Spiveys concerning the way the carwashes were being operated and the books were being handled. After many discussions, which did not resolve the differences, the Lewises were ready to sell either Doo Wop entirely, or, at least, their interest in Doo Wop. Because of continuing differences, the Lewises filed suit against the Spiveys in Washington County Circuit Court in January 2007. On the day before the scheduled state court trial, the Spiveys filed their voluntary chapter 7 bankruptcy petition.

## II. Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## III. Preliminary Matters
### A. Standing

At the beginning of trial, counsel for the Spiveys objected to the standing of the Lewises to bring a complaint under § 523(a)(4) and maintained a continuing objection to standing throughout the pendency of the trial. Counsel argued that if funds from Doo Wop were improperly used, then, because the funds belonged to Doo Wop, Doo Wop would be the party in interest and the proper party to bring the action. According to the Spiveys, the complaint should be a derivative action in the name of Doo Wop. The Court overruled the Spiveys' objection at trial; however, upon further consideration, the Court sustains the objection and grants the Spiveys' motion to dismiss the § 523(a)(4) cause of action for lack of standing.

Under the Spiveys' argument, the Lewises did not have standing to bring this lawsuit

under § 523(a)(4) because the alleged damage was damage to Doo Wop, not the Lewises individually.  Judge Richard Arnold stated the issue of standing succinctly:

> That a plaintiff must have standing in order to pursue a lawsuit is firmly rooted in our constitutional history, and requires that a plaintiff allege a judicially cognizable and redressable injury.  As the Supreme Court has said, "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  *To have standing, a plaintiff must allege an injury that is fairly traceable to the defendant's conduct, and the requested relief must be likely to redress the alleged injury.*

*Novartis Seeds, Inc. v. Monsanto Co.*, 190 F.3d 868, 871 (8th Cir. 1999) (emphasis added).  The question before the Court related to standing is whether the Lewises, individually, are entitled to have the Court decide the merits of their dispute with the Spiveys, or whether the action needs to (or can only) be brought as a derivative action.

The Court could not locate any cases that address a derivative cause of action related to limited liability companies in Arkansas.  However, a number of Arkansas corporate law and partnership cases discuss the direct/derivative distinction and provide substantial guidance.  *See, e.g., Golden Tee, Inc. v. Venture Golf Sch., Inc.*, 969 S.W.2d 625 (Ark. 1998); *Brandon v. Brandon Const. Co.*, 776 S.W.2d 349 (Ark. 1989).  The general rule that has developed relates to whether the plaintiff has been injured directly or independently of the corporation or partnership.  *Golden Tee*, 969 S.W.2d at 628.  The Lewises would have standing to bring the § 523(a)(4) cause of action if they could assert "'a direct injury to the shareholder distinct and separate from harm caused to the corporation.'"  *Id.* at 629 (quoting *Hames v. Cravens*, 966 S.W.2d 244 (Ark. 1998)); *see also Brandon*, 776 S.W.2d at 352 ("a shareholder may sue to redress injuries received by him regardless of whether the same wrong may have injured the corporation").

The Lewises have alleged and proved to the Court that the Spiveys were either paid, or obligated Doo Wop to pay, management fees.  Taking into consideration Mr. Spivey's testimony that the Spiveys did not put any money into Doo Wop and never authorized any money be paid to the Lewises, and Ms. Spivey's testimony that the Lewises'

investments in Doo Wop were considerably more than the Spiveys', the Court finds that the Lewises have asserted a direct injury separate and distinct from any injury suffered by Doo Wop with regard to the Lewises' § 523(a)(2)(A) cause of action. However, the Court cannot find a direct injury with regard to their § 523(a)(4) cause of action. Under § 523(a)(4), the bankruptcy code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). This subsection is comprised of three separate exceptions: (1) fraud or defalcation while acting in a fiduciary capacity, (2) embezzlement, and (3) larceny.[1] To establish standing the Lewises must prove they suffered a direct injury as a result of either a fiduciary relationship that existed between the Lewises and the Spiveys, or embezzlement.

### 1. Fiduciary as Corporate Officer/Specific Statute

The Spiveys argued that the first exception under § 523(a)(4), which relates to a breach of fiduciary duty, should be dismissed for lack of an express trust creating the fiduciary duty. The Lewises argued that a fiduciary duty was created by the fact that Mr. Spivey was the managing member of Doo Wop. It appears that both parties are correct.

The determination of a fiduciary relationship under § 523(a)(4) is a question of federal law. *Tudor Oaks Ltd. P'ship v. Cochrane* (*In re Cochrane*), 124 F.3d 978, 984 (8th Cir. 1997). The federal law relating to § 523(a)(4) is clear and well established: "'[t]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.'" *Id*.

---

[1] The third exception--larceny--is not implicated. Larceny is the "fraudulent and wrongful taking and carrying away of the property of another with the intent to convert the property to the taker's use without the consent of the owner." 4 Collier on Bankruptcy ¶ 523.10[2], at 523-77 (16th ed.). The primary difference between larceny and embezzlement involves the initial taking of the property. For larceny, the taking must be unlawful. *Id.* Because the Spiveys were members of Doo Wop, and Mr. Spivey was the managing member, any property alleged to have been taken by the Spiveys would have come into their possession or control lawfully and would not satisfy the elements of larceny.

(quoting *Lewis v. Scott*, 97 F.3d 1182, 1185 (9th Cir. 1996)). A fiduciary relationship could also arise through a statute or other state law rule creating fiduciary status that is "cognizable" in bankruptcy proceedings. *Barclays Am./Bus. Credit, Inc. v. Long* (*In re Long*), 774 F.2d 875, 878 (8th Cir. 1985) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)). The *Long* court further recognized that "there are cases charging individuals, by virtue of their corporate officer status, with the corporation's fiduciary duties. To the extent these cases hold that a statute or other state law rule may create fiduciary status in an officer which is cognizable in bankruptcy proceedings, we agree." *Id.* (citations omitted).

In this case, there was no express or technical trust imposed among the members of Doo Wop; nor does the Operating Agreement constitute a trust agreement. However, Arkansas case law recognizes an officer's or director's fiduciary relationship to a corporation, predicated on the fact that the officer or director voluntarily accepted the position of trust. *Taylor v. Terry*, 649 S.W.2d 392, 392-93 (Ark. 1983) (recognizing a fiduciary duty related to "corporate opportunity"). By analogy, a managing member of a limited liability company may also have a fiduciary relationship with the limited liability company by virtue of his position. Also, under the Arkansas Small Business Entity Tax Pass Through Act, in some instances a member or manager of a limited liability company must "hold as trustee" *for the company* any profit or benefit derived by that person from certain transactions or use of the company's property. Ark. Code Ann. § 4-32-402(2) (Repl. 2001).[2] Both Arkansas case law and an Arkansas statute support the creation of a

---

[2] Ark. Code Ann. § 4-32-402(2) (Repl. 2001) states:
Unless otherwise provided in an operating agreement:
. . .
(2) Every member and manager must account to the limited liability company and hold as trustee for it any profit or benefit derived by that person without the consent of more than one-half (1/2) by number of the disinterested managers or members, or other persons participating in the management of the business or affairs of the limited liability company, from any transaction connected with the conduct or winding up of the limited liability company or any use by the member or manager of its

5

fiduciary relationship in the absence of an express or technical trust.  *See also Bell v. Collins* (*In re Collins*), 137 B.R. 754, 756 (Bankr. E.D. Ark. 1992) (finding that Arkansas's long recognized rule that a corporate officer is charged with a fiduciary duty to the corporation is sufficient for a § 523(a)(4) cause of action).

Even so, the Eighth Circuit defines trustee in the "strict and narrow sense," as required by the United States Supreme Court.  *Long*, 774 F.2d at 878 (referencing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).  The Court recognizes that under Arkansas law the Spiveys may have a fiduciary duty to the limited liability company in the absence of an express or technical trust.  However, that particular fiduciary relationship does not necessarily extend to other members of Doo Wop individually sufficient to allow the Lewises in their *individual* capacity to proceed under the first prong of § 523(a)(4).  While the Lewises have shown a direct injury relating to the management fees for the purposes of § 523(a)(2)(A), the Court cannot expand the fiduciary capacity required under § 523(a)(4) to show a direct injury to the Lewises under § 523(a)(4).  Accordingly, the Court finds that the Lewises' allegation of fraud or defalcation while acting in a fiduciary capacity as it relates to them individually is not cognizable to the extent required to determine the dischargeability of a debt under the first prong of § 523(a)(4).

### 2. Embezzlement

The second exception under § 523(a)(4)--embezzlement--is defined as,

> the "fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *In re Schultz*, 46 B.R. 880, 889 (Bankr. D. Nev. 1985).  A plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used.

*Belfry v. Cardozo* (*In re Belfry*), 862 F.2d 661, 662 (8th Cir. 1988).  According to a

---

property, including, but not limited to, confidential or proprietary information of the limited liability company or other mattes entrusted to the person as a result of his or her status as manager or member.

6

Missouri bankruptcy court, "[i]f the debtor has appropriated funds for his own benefit, and has done so with fraudulent intent or by deceit, then it would appear the creditor need prove no more . . . ." *In re Beasley*, 62 B.R. 653, 655 (Bankr. W.D. Mo. 1986) (citing *U.S. v. Walker*, 677 F.2d 1014 (4th Cir. 1982)). To establish standing, the Lewises must prove a direct injury. At issue is the payment by Doo Wop of Ms. Spivey's American Institute of Certified Public Accountants [AICPA] dues in the amount of $1069.00.

It is clear from the Operating Agreement that the payment of the AICPA dues from the funds of Doo Wop was not authorized. According to Doo Wop's Operating Agreement,

> [w]ithout the unanimous consent of the Members, no Member and no Person to whom the Members have delegated management authority shall have authority to do any of the following:
> . . .
> (xi) cause the LLC to pay or become obligated to pay compensation of any type to any Member or any Person to whom the Members have delegated management authority.

Lewis Ex. 8, Operating Agreement for Doo Wop, LLC, p.6 Section 5.2. The testimony regarding the payment of the AICPA dues was straightforward--the Spiveys recognized, without explanation, that the dues were paid out of Doo Wop's account. Ms. Spivey testified that attorney West Doss drafted the Operating Agreement for Doo Wop and that there were several different drafts. The Spiveys and the Lewises reviewed the documents until it was considered finished and the final Operating Agreement was signed. Presumably, having reviewed the Operating Agreement, the Spiveys knew or should have known that the payment of Ms. Spivey's individual AICPA dues was not an authorized payment under the terms of the Operating Agreement. This disregard of the Operating Agreement may be indicative of the fraudulent intent required to prove embezzlement. *See, e.g., Wallner v. Liebl* (*In re Liebl*), 434 B.R. 529, 537 (Bankr. N.D. Ill. 2010) (finding that disregard of the LLC's rules indicated fraudulent intent). However, the status of the ownership of the property must be determined with regard to either the operating agreement or state law. *Murrin v. Scott* (*In re Scott*), 403 B.R. 25, 42 (Bankr. D. Minn. 2009). In this instance, the Court is presented with clear testimony from the Spiveys that the dues were paid out of Doo Wop's account, with no indication where the

7

funds came from. At the time the dues were paid, the funds would have been property of Doo Wop, not the Lewises--even if the funds had been deposited into the account by the Lewises. Accordingly, the Court finds that the Lewises could not, in their own right, claim a "fraudulent appropriation" that would give rise to embezzlement under § 523(a)(4). *Id.*

Because the Court finds there is no direct injury to the Lewises individually under § 523(a)(4), the Court grants the Spiveys' motion to dismiss that portion of the complaint relating to § 523(a)(4) for lack of standing.

### B. Statute of Limitations

Counsel for the Spiveys also asserted the affirmative defense of statute of limitations related to fraud, correctly stating that under Arkansas law a cause of action for fraud must be brought within three years. The Spiveys' counsel argued that any claim for damages related to fraud that preceeded three years from the initial state litigation would be outside the period of time from which damages could be calculated. However, as will be discussed below, the relevant statute of limitations relates to a breach of contract under the terms of the operating agreement. In Arkansas, that statute of limitations is five years, not three.

As discussed below, the gravamen of the Court's decision is based on the management fees that were paid to the Spiveys. At the earliest, these fees would have been disclosed in the spring of 2002.[3] The state court lawsuit was filed in January 2007 [p.310], less than five years later. Neither party introduced the state court lawsuit into evidence in the bankruptcy adversary proceeding, so the Court does not know what allegations or counts were alleged. While it may be true that the Lewises sued the Spiveys for fraud in state

---

[3] In fact, it is doubtful that any financial information was disclosed this early. According to Mr. Lewis, the Poplar Street carwash began operating in the fall of 2001 and there was little financial information from the first year.

court, the complaint before this Court relates to § 523(a)(2): an exception to the discharge of a *debt* obtained by either false pretenses, a false representation, or actual fraud. The specific representations that were made concern the management fees that were paid to the Spiveys or for which the Spiveys obligated the LLC to pay. The *debt* to which the representations relate arises from a breach of the Operating Agreement; in other words, a breach of contract. Under Arkansas law, the statute of limitations for an action to enforce written obligations, duties, or rights is five years. Ark. Code Ann. § 16-56-111 (Repl. 2005). The time began to run when the Lewises could have first maintained their action against the Spiveys, which would not have been prior to receiving the first financial disclosure in the spring of 2002. Because the debt falls within the five year statute of limitations, the Court finds that the Spiveys' affirmative defense asserting statute of limitations fails.

### IV. Determination of Dischargeability of Debt

According to the Lewises, the debt at issue in this case encompasses many forms, including, but not limited to, the Lewises belief that the Spiveys (1) "skimmed" money from the car washes by not properly accounting for the cash received, (2) commingled funds belonging to Doo Wop with funds belonging to some of the Spiveys' other business interests, (3) over-authorized the use of sales discounts at the car washes, and (4) paid themselves management fees and authorized the payment by Doo Wop of other personal obligations not authorized under the Operating Agreement. In support of their first three allegations, the Lewises relied primarily on the testimony of George A. Byram, a certified public accountant and certified fraud examiner. Mr. Byram identified a number of "red flags" such that he was able to conclude there was the likelihood of fraud in the operation of Doo Wop.

In opposition to Mr. Byram's testimony, the Spiveys relied primarily on the testimony of Sue Talkington, also a certified public accountant and certified fraud examiner. While Mr. Byram identified "red flags" and messy record keeping, Ms. Talkington examined the actual books and records of Doo Wop to recreate the accounting used by Ms. Spivey

and determine independently the accuracy of the records.  Ms. Talkington testified that everything she asked for was organized and available.  Without assistance from Doo Wop employees, Ms. Talkington was able to recreate the system used by Ms. Spivey and found that all of the examined entries were supported by other data.

The Court finds both witnesses credible and knowledgeable in their field.  Usually, when two experts testify, the data provided by one of the experts will contradict or dispell the testimony of the other expert.  While Mr. Byram identified a number of what he referred to as "red flags," Ms. Talkington was able to explain with clarity how some of the red flags that Mr. Byram used indicated an area that needed further exploration or explanation.  Ms. Talkington explored some of those areas and was able to explain the related red flags to the Court.  Because the Court cannot say with certainty that any of the red flags were the result of fraud, the Court finds that the Lewises did not meet their burden of proof by a preponderance of the evidence and must deny that part of the complaint not related specifically to the management fees, the payment of Ms. Spivey's AICPA dues, and the payment to the Spiveys' attorney from Doo Wop funds, all of which will be discussed below.

Section 523(a)(2)(A) of the Bankruptcy Code states that discharge is not available to a debtor for any debt for money, property, or services obtained by "false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  Under this section, in order to prevail, the plaintiff must prove by a preponderance of the evidence the following:

        1.    that the debtor made a representation;
        2.    that at the time the debtor knew that the representation was false;
        3.    that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor;
        4.    that the creditor justifiably relied on such representation; and
        5.    that the creditor sustained the alleged loss and damage as a proximate result of the representation having been made.

*Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (quoting *Thul v. Ophaug,* 827 F.2d 340 (8th Cir. 1987)).  Unless there is

sufficient proof as to each element, judgment cannot be entered for the plaintiff.

The representations at issue relate to the payment of management fees to the Spiveys and the payment of the Spiveys' attorney fees from Doo Wop.[4] As stated above, the Operating Agreement states that,

> [w]ithout the unanimous consent of the Members, no Member and no Person to whom the Members have delegated management authority shall have authority to do any of the following:
> . . .
> (xi) cause the LLC to pay or become obligated to pay compensation of any type to any Member or any Person to whom the Members have delegated management authority.

Lewis Ex. 8, Operating Agreement for Doo Wop, LLC, p.6 Section 5.2. According to the Operating Agreement, and confirmed by Mr. Spivey, Mr. Spivey was the managing member of Doo Wop with "complete authority and exclusive control over the management of the business and affairs of the LLC." Lewis Ex. 8, Operating Agreement for Doo Wop, LLC, p.6 Section 5.1. Even so, according to Mr. Lewis, the Lewises never agreed to let the Spiveys take a management fee, which, under the terms of the Operating Agreement, would include the accrual of management fees that would inure to the benefit of the Spiveys. Based on this testimony, it is clear that the members of Doo Wop never gave the unanimous consent required to "cause the LLC to pay or become obligated to pay compensation *of any type* to any Member or to any Person to whom the Members have delegated management authority."[5]

---

[4] Although the Court references the payment of management fees, it also includes in this discussion the accrual of management fees on the books of Doo Wop. A discussion of the payment of the AICPA dues in the amount of $1069.00 is not included in this section; the Court finds that the requisite representation does not exist.

[5] The Spiveys argued repeatedly that the Lewises knew about the payment or accrual of management fees "from day one," presenting, perhaps, a waiver defense for their actions. Regardless, the issue is not whether the Lewises knew the fees were being paid or accrued. The issue is the continuing representations by the Spiveys that the payment or accrual of the fees would cease.

According to Mr. Lewis, the Lewises received Doo Wop's first financial report in April 2002 for 2001. Nothing in that report led him to believe that fees were being taken by the Spiveys. His first indication that fees were being taken came in spring 2004 after reviewing the 2002 financial information.[6] At that time he saw entries for the payment of $12,500.00 and $3700.00 for management fees. When he asked Ms. Spivey about the fees, she said she had misposted the fees and would correct the entry. Mr. Spivey agreed and said they were not taking fees until the company became profitable. After these representations, Mr. Lewis believed the receipt of fees would be corrected.

Regardless of whether the correction was ever made, the Spiveys continued to accrue management fees. Mr. Lewis again contacted Mr. Spivey in early 2005 to let Mr. Spivey know that the financial records reflected that management fees were still being accrued. According to Mr. Lewis, Mr. Spivey simply responded with "okay." In early 2006, Mr. Lewis again noticed that management fees were continuing to be accrued. He also noticed a setoff of accrued management fees in the total amount of $90,000.00 against an account receivable from another of the Spiveys' businesses. To resolve the dispute, the Lewises and the Spiveys agreed to meet at the attorney's office who drafted the Operating Agreement. At that time, according to Mr. Lewis, approximately $106,000.00 had been paid in management fees.[7] At the conclusion of the May 2006 meeting, the parties agreed that the Spiveys were not to continue taking or accruing management fees, and would each be responsible for their respective attorney fees, presumably because Doo Wop did not have funds to pay the fees. Despite this agreement, the Spiveys paid their respective attorney fees from the Doo Wop account.

The Spiveys repeatedly attempted to assure the Lewises that the payment or accrual of

---

[6] According to Mr. Lewis, he asked for the 2002 report in spring 2003; it was not provided to him until spring 2004.

[7] The $90,000.00 offset and the initial payments of $12,500.00 and $3700.00 total $106,200.00.

12

management fees was done in error and would be corrected. Based on the Spiveys' continuing actions prior to the 2006 meeting, the Court finds that at the time those assurances were given, the Spiveys knew that the assurances were false and that the fees would continue to be paid, either in cash, by set-off of accounts receivable from their other companies, or by accrual and later payment. Further, the Court finds that based on the Spiveys' course of conduct, when the Spiveys agreed to be responsible for their portion of the attorney fees related to the meeting in May 2006, they knew at the time that they were not going to pay their portion of the fees individually; rather, they would pay the fees from the Doo Wop account regardless of their agreement with the Lewises.

The Court further finds that when the statements relating to the management fees were made, the Spiveys intended to continue taking, accruing, or setting off the fees. The statements were made with the intent to deceive the Lewises and alleviate their immediate concerns relating to cash flow and the payment of fees. They were, in essence, "'promises made without an intention of performance.'" *R&R Ready Mix v. Freier* (*In re Freier*), 604 F.3d 583, 588 n.2 (8th Cir. 2010) (quoting 37 Am. Jur. 2d *Fraud and Deceit* § 90). The statements obfuscated the actions taken by the Spiveys. The Court finds that the Spiveys intended to either take or accrue management fees from the beginning of the relationship, even when they entered into the Operating Agreement, and in spite of later assurances to Mr. Lewis. At trial, Mr. Spivey testified that it would be "ridiculous" not to take the fees: "I mean, how crazy does that sound that we form a corporation and I buy into this and I will never take any compensation for working seven days a week." According to Mr. Lewis, Ms. Spivey admitted at the 2006 meeting that she did not do anything she has not always done.

Based on their continuing course of conduct, the Court also finds with respect to the payment of the attorney fees from the Doo Wop account, that the Spiveys made the agreement to split the cost of the fees with the intent to deceive the Lewises. The Spiveys knew they had no intention of paying the fee individually when the agreement was made and, again, made a promise with no intention of performing.

13

Every time the Lewises identified the accrual, payment, or set off of management fees and brought it to the Spiveys attention, the Spiveys assured the Lewises that the problems would be corrected. The Court finds that the Lewises justifiably relied on those statements, and believing the entries or payments would be corrected, the Lewises maintained the business relationship with the Spiveys. Justifiable reliance is an intermediate standard between mere reliance and reasonable reliance and is all that is required under § 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 74-75 (1995). The business relationship was built upon a friendship of many years between the parties. The Court is convinced it was this friendship that allowed the Lewises to believe the Spiveys would perform when they said they would, at least until the meeting in May 2006.

The business relationship continued through the May 2006 meeting, at the conclusion of which the parties agreed to split the cost of attorney fees related to the meeting. The Court also finds that the Lewises justifiably relied on the Spiveys' agreement to pay their respective attorney fees individually, rather than through Doo Wop.

Finally, Mr. Lewis testified that he advanced approximately $388,000.00 to Doo Wop. This amount purportedly represents the direct injury to the Lewises distinct and separate from any harm caused to Doo Wop, against which damages related specifically to the management fees and the payment of the Spiveys' attorney from Doo Wop funds should be measured. Mr. Lewis engaged the services of Moore, Stephens & Frost [MSF] to review the Doo Wop records. According to the Spiveys' Exhibit D-5, the MSF report showed management fees in the amount of $339,000.00. Also according to Exhibit D-5, Ms. Spivey was able to reconcile the MSF management fees and determined the fees to be $253,400.00. Because the fees that are included in Ms. Spivey's reconciliation include accrued fees not yet paid, the Court cannot find that the Lewises were damaged in that amount. However, the Court does find that the Lewises were damaged in the amount of fees actually paid or set off against another of the Spiveys' businesses in the total amount of $144,200.00. The total amount consists of $50,000.00 that was set off in 2004; $40,000.00 that was set off in 2005; the payments of $12,500.00 and $3700.00;

14

forgiven management fees reflected as capital contributions in the amount of $37,000.00; and an additional payment of $1000.00; all of which are disclosed on the Spiveys' Exhibit 5.

For the above reasons, the Court finds that the Lewises have met all of the elements required under § 523(a)(2)(A) with regard to the payment or set off of management fees. The Court finds that a debt in the amount of $144,200.00 is not dischargeable in the Spiveys' bankruptcy and will enter a separate judgment in that amount in favor of the Lewises. Because neither side put on evidence as to the amount of attorney fees that were paid by Doo Wop for the benefit of the Spiveys relating to the May 2006 meeting, the Court cannot find that the damage element was proven and must deny the Lewises complaint under § 523(a)(2)(A) with regard to the attorney fees.

## V. Conclusion

For the reasons stated above, the Court denies the Lewises' complaint under § 523(a)(4), and grants the Lewises' complaint under § 523(a)(2)(A) in the amount of $144,200.00 relating to the payment or set off of management fees. The Court will enter judgment against the Spiveys and in favor of the Lewises by separate order.

IT IS SO ORDERED.

November 22, 2010
DATE

BEN T. BARRY
UNITED STATES BANKRUPTCY JUDGE

cc:  Donald E. Wilson, attorney for the Lewises
     Kenneth R. Shemin, attorney for the Lewises      **EOD** 11/22/2010
     Gail Inman-Campbell, attorney for the Spiveys    **by A. Penrod**